IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAUTILUS INSURANCE COMPANY | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| GREEN EYE TECHNOLOGY, LLC; and | : | NO. 11-7322 |
| RORY CUTAIA | : | |
| | : | |
| Defendants | : | |

MEMORANDUM RE: DEFENDANT'S MOTION TO DISMISS

**Baylson, J.**                                                                                                    **November 7, 2012**

    **I.**    **INTRODUCTION**

This case involves Plaintiff Nautilus Insurance Company's ("Nautilus") request for a declaration of rights under a commercial general liability insurance policy ("Policy") it issued to Defendant Green Eye Technology, LLC ("Green Eye"). Nautilus seeks a declaration that the Policy does not entitle Green Eye to either defense or indemnity in a separate lawsuit filed by Defendant Rory Cutaia in the United States District Court for the Western District of Virginia.

Presently before the Court is Defendant Cutaia's Motion to Dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Because the parties concede that Cutaia is a necessary and indispensable party pursuant to Federal Rule of Civil Procedure 19(a)(2), the entire action must be dismissed if this Court concludes, as it does, that it cannot exercise personal jurisdiction over Cutaia. For the reasons discussed below, the Defendant's Motion to Dismiss is granted.

**II.     FACTUAL & PROCEDURAL BACKGROUND**

Plaintiff, Nautilus, is an Arizona corporation with a principal place of business in Scottsdale, Arizona.  Am. Compl. ¶ 2.  Defendant Green Eye is a limited liability company whose only member, Wendy Smith, is a citizen of the Commonwealth of Pennsylvania.  Id. ¶ 3-4.  Defendant Cutaia is a resident and citizen of the Commonwealth of Virginia.  Am. Compl. ¶ 5; Cutaia's Aff. ("Aff.") ¶ 1.

On September 11, 2001, Cutaia—who had an office near the World Trade Center in New York City—personally witnessed the death and destruction that occurred from the tragic course of events on that day.  Mem. in Support of Def's Motion to Dismiss Am. Compl., Ex. B ("Cutaia's Am. Compl.") ¶ 8.  The experience produced in Cutaia a strong desire to "secure and protect his family from future disasters and occurrence of terrorism."  Id.  In or about 2008, Cutaia contacted Radius Engineering International ("Radius"), a New Hampshire corporation headquartered in Terrell, Texas, that manufactures "Weapons of Mass Destruction" (WMD) shelters that are designed to provide long-term living environments in the aftermath of nuclear, biological, and chemical weapon attacks.  Id. ¶ 10-11.  At the time Cutaia contacted Radius, Green Eye was the exclusive installer of Radius-manufactured shelters.  Cutaia's Dep. ("Dep.") at 43.

After reaching out to Radius, Cutaia stated that he would like to "see a shelter and talk to someone who actually had one installed."  Dep. at 80.  In response, Radius's President, Walter McCarthy, proposed that Cutaia come view a shelter that would soon be delivered to the East Coast, telling Cutaia that his transportation would be arranged by George Welhaf, Jr, an employee from Green Eye.  Id.  Soon thereafter, Cutaia was escorted by limousine to a Home

Depot parking lot located in what he believed to be Pennsylvania. Id. at 81; Aff. ¶ 6. As Cutaia later learned, however, the parking lot was actually located in Delaware.[1] Dep. at 81; Aff. ¶ 6.

At the Home Depot parking lot, Cutaia was met by both McCarthy and Welhaf who showed him a pre-manufactured shelter that was being transported by truck. Dep. at 81. Cutaia was informed at the meeting that Radius "worked jointly and collectively" with Green Eye and, therefore, that if he was to select Radius to build the shelter, Green Eye would have to install it. Cutaia's Am. Compl. ¶ 12; Dep. at 43; Aff. ¶ 22. During, or following, the meeting, Cutaia received a report from Green Eye that was produced by Radius titled "Ethos WMD Underground Community Preliminary Brief Report" ("Preliminary Report") which described the parameters of the shelter that Radius would build and the time frame for its installation. Cutaia's Am. Compl. ¶ 11. Cutaia was also referred by Radius to a customer who had a Radius shelter installed by Green Eye. Dep. at 68. The customer, whose address is not provided in the record, told Cutaia that he was satisfied with the quality of the work. Id.

Between the time of the Delaware meeting and late 2009, Cutaia estimates that he met with representatives of Radius "or" Green Eye "five or six times" to discuss "potential sites" for the shelter.[2] Id. at 63-64. Half of the meetings took place at Cutaia's office in Manhattan, and

---

[1] In Cutaia's complaint in the Virginia action, he stated that the meeting took place in Pennsylvania. Aff. ¶ 8. After Nautilus filed the instant action for declaratory judgment, Cutaia filed an amended complaint which stated that the meeting took place in Delaware. Id. In its answer to Cutaia's amended complaint, Green Eye admitted that Delaware was the correct location. Mem. in Support of Def's Motion to Dismiss Am. Compl., Ex. D, ¶ 6.

[2] Cutaia gave this estimate at his deposition in response to the following question from Nautilus's counsel: "[B]esides this one meeting that you originally referenced as having occurred in Pennsylvania, did you ever meet outside your property in Virginia with anybody else from Radius or Green Eye?" Dep. at 63 (emphasis added). Since the question was phrased in the disjunctive, it is unclear how many of these five or six meetings included representatives from

half took place in Virginia.  Id. at 64.  At some undefined point during these months, Cutaia entered into an oral contract with Radius to build the shelter for $1,648,560.00, and a separate oral contract with Green Eye to install it for $786,513.75.[3]  Cutaia's Am. Compl. ¶ 13-14.

In or about October 2009, Radius began shipping the component parts of the shelter to Cutaia's property in Virginia and shortly thereafter, Green Eye commenced the installation.  Id. ¶ 18.  Rather than taking four months, however, the project encountered numerous delays due to alleged defects in component parts and negligent performance by Green Eye.  Id. ¶ 19-35.  In March 2011, with the project not yet completed, Green Eye terminated its work and, despite repeated inquiries by Cutaia, refused to return to the work site.  Id. ¶ 36.  Soon thereafter Cutaia brought suit against both Radius and Green Eye, alleging, *inter alia*, breach of contract, negligence, and fraud in the inducement.  Id. ¶ 42-127.

After Cutaia brought suit in the United States District Court for the Western District of Virginia, Nautilus filed a Complaint for a declaratory judgment with this Court regarding its obligations to defend and indemnify Green Eye against Cutaia's claims.  (ECF No. 1).  After process was served on the two named defendants (Cutaia and Green Eye), Green Eye failed to appear, prompting Nautilus to file a Motion for Entry of Default.  (ECF No. 10).  On January 30, 2012, this Court granted Nautilus's Motion for Entry of Default against Green Eye.  That same

---

Green Eye.  However, since Cutaia's amended complaint in the Virginia litigation states that Green Eye helped him select the location for the shelter, Cutaia's Am. Compl. ¶ 15, and since the meetings in Virginia and New York dealt with locating "potential sites" for the shelter, Dep. at 63-64, it can reasonably be deduced that a Green Eye representative(s) was present for at least some, if not all, of these meetings.

[3] The Court finds it surprising (given the sophisticated status of the parties and the expense/complexity of the project) that the parties would not have reduced the terms of their agreements to writing.  Nautilus, however, does not allege, nor does any evidence in the record show, that any such written contracts exist.  See Dep. at 43-44.

day, Cutaia filed a Motion to Dismiss for lack of both subject matter jurisdiction and personal jurisdiction. (ECF No. 11). On May 30, 2012, this Court issued a memorandum and order granting, without prejudice, Cutaia's motion with respect to subject matter jurisdiction, and declining to reach the question of personal jurisdiction. (ECF No. 14). Thereupon, Nautilus filed an Amended Complaint on June 15, 2012, (ECF No. 15), and Cutaia renewed his Motion to Dismiss for lack of personal jurisdiction (or, in the alternative, to transfer venue to the Western District of Virginia) on June 28, 2012, (ECF No. 17).

On August 10, 2012, the Court held a hearing on Cutaia's motion and ordered the parties to determine the discovery necessary for resolving the personal jurisdiction issue. (ECF No. 26). On August 15, the parties reported to the Court that their attempts to agree upon the scope and extent of discovery had proved unsuccessful. (ECF Nos. 23-24). Cutaia contended that Nautilus's request for, *inter alia*, any and all written communications, contracts, invoices, and receipts relating to Green Eye's work for Cutaia, was a "broad fishing expedition" that, in essence, was seeking "full blown discovery on the merits of the dispute underlying the insurance coverage" issue. Aug. 15, 2012 Letter from Cutaia's Counsel, at 1, 3. To break this impasse, the Court issued a written order that Nautilus depose Cutaia for up to two hours and that the parties further brief the jurisdiction issue following the deposition. (ECF No. 25). In this order, the Court stated that either party "may specifically request any other discovery which is reasonable under the circumstances." As per the order, Cutaia's deposition was taken and the parties provided additional briefs to the Court on the jurisdiction issue. (ECF Nos 27-28). Neither party requested additional discovery or an evidentiary hearing.

### III.   LEGAL STANDARD[4]

The burden of proving personal jurisdiction rests on the plaintiff.  O'Connor v. Sandy Lane Hotel, Ltd., 496 F.3d 312, 316 (3d Cir. 2007).  Where, as here, there has been no evidentiary hearing, a court deciding a Rule 12(b) motion to dismiss determine if the plaintiff has made out a prima facie case after taking all of the plaintiff's factual allegations as true and resolving all factual disputes in plaintiff's favor.  Id.; see also Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009).

Federal Rule of Civil Procedure 4(k) authorizes a federal district court to assert personal jurisdiction over a non-resident defendant to the extent permitted by the law of the state where the court sits.  See O'Connor, 496 F.3d at 316.  Pennsylvania's long-arm statute provides that courts may exercise personal jurisdiction over non-residents "to the fullest extent allowed under the Constitution of the United States . . ."  42 Pa. Cons. Stat. Ann. § 5322(b); see also Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 150 (3d Cir. 1995) ("Pennsylvania's long-arm statute provides that its reach is coextensive with the limits placed on the states by the federal Constitution.").

The "constitutional touchstone" in a personal jurisdiction inquiry is "whether the defendant purposefully established 'minimum contacts' in the forum State," such that "he should

---

[4] This Court has subject-matter jurisdiction over this action because Nautilus is an Arizona corporation, Green Eye's one member is a citizen of Pennsylvania, Cutaia is a citizen of Virginia, and the amount in controversy exceeds $75,000.  See 28 U.S.C. § 1332; Zambelli Fireworks Mfg. Co., Inc. v. Wood, 592 F.3d 412, 420 (3d Cir. 2010) (holding that, for purposes of diversity jurisdiction, the citizenship of limited liability companies "is determined by the citizenship of its members").

reasonably anticipate being haled into court there."[5]  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471, 475 (1985).  What constitutes "minimum contacts" depends on the type of personal jurisdiction being alleged: general jurisdiction or specific jurisdiction.  Metcalfe, 566 F.3d at 334.  General jurisdiction exists if the defendant "has 'continuous and systematic' contacts with the forum, whether or not those contacts are related to the plaintiff's cause of action."  Id. (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984)). Specific jurisdiction exists "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  Id. (quoting Burger King, 471 U.S. at 471 and Helicopteros, 466 U.S. at 414).

## IV. ALLEGED BASIS FOR PERSONAL JURISDICTION

Nautilus contends that both general and specific jurisdiction can be exercised over Cutaia in this action.  Nautilus contends that general jurisdiction can be asserted based on several business-related connections Cutaia has had with Pennsylvania.  Although Cutaia has never visited Pennsylvania in his life other than driving across the Commonwealth on a handful of occasions during trips to other locations, Dep. 71-72, Nautilus argues that the following business-related connections constitute "continuous and systematic contacts":

- In 2006, while serving as President and CEO of Colo Properties, Inc. (a company incorporated in Delaware), Cutaia entered into a lease that required payments to be sent to an address in Pittsburgh, Pennsylvania.  Pl's Supp. Mem. Supporting Ct.'s Exercise of Jurisdiction ("Pl's Mem. II"), at 10.

---

[5] There are situations where assertion of personal jurisdiction can still offend "traditional notions of fair play and substantial justice," Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945), and violate the Due Process Clause despite the presence of minimum contacts.  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-78 (1985). This issue only arises, however, if the plaintiff can meet its burden of showing minimum contacts.  See O'Connor 496 F.3d at 324.

- During his tenure from 2006 to 2011 as a private equity partner at Corinthian Capital (a company based in New York City), Cutaia served as a director "sometime in 2009" for a company (Sabre Industries, Inc.) headquartered in Pennsylvania. Id. at 8.
- Cutaia provided capital and served as executive chairman of a company (Allied Fiber) that unsuccessfully sought to lay a pipeline between New York City, Chicago, and Ashburn, Virginia, a portion of which would cross Pennsylvania. Id. at 8-9.
- While Cutaia was with Corinthian, the company hosted a conference in Pennsylvania and issued a notice of sale of securities to purchasers in all states, including Pennsylvania. Id. at 9-10.
- In the early 1990s, Cutaia co-managed a boxer who fought one of his twenty-three matches in Pennsylvania. Id. 10.

With respect to specific jurisdiction, Nautilus argues that Cutaia knowingly established a continuing relationship with a Pennsylvania company by entering into an $850,000 contract and engaging in frequent communications with Green Eye. Although Cutaia states that he did not know that Green Eye was a Pennsylvania company, Nautilus argues that we should infer such knowledge based on Cutaia's status as a "sophisticated entrepreneur," Cutaia's admission that he knew Welhaf was a resident of Pennsylvania, and the fact that Green Eye's marketing materials specifically stated that it was based in Pennsylvania. Dep. at 87; Pl's Mem. Opp. Mot. to Dismiss ("Pl's Mem. I") at 7. Further, although contracting with Green Eye was a non-negotiable condition of Cutaia's contract with Radius, Nautilus argues that Cutaia "actively chose to hire Green Eye" by agreeing to contract with them after speaking with one of their past customers. Finally, although Cutaia was promised that the shelter would be completed within four months, Nautilus contends that the two years of periodic work that Green Eye performed demonstrates a continuing relationship between the parties, particularly since such a project would be expected to contain warranties and necessitate maintenance work by Green Eye for many years into the future.

V.   **ANALYSIS**

A.   **General Jurisdiction**

Although Nautilus claims otherwise, Cutaia's sporadic business connections to Pennsylvania fall far short of the "continuous and systemic contacts" required to justify a court's assertion of general jurisdiction. As an initial matter, it bears reiterating that the "continuous and systematic" standard is "not an easy one to meet." Surgical Laser Tech., Inc. v. C.R. Bard, Inc., 921 F. Supp. 281, 284 (E.D. Pa. 1996). This was illustrated by the analysis in Helicopteros where the Supreme Court concluded that a non-resident helicopter transportation did not have continuous and systematic contacts despite a seven-year relationship with the forum during which it: (1) purchased eighty percent of its helicopter fleet from the forum; (2) sent its prospective pilots to train in the forum; (3) sent its management and maintenance personnel to the forum for technical consultations; and (4) received $5 million in payments from a company headquartered in the forum. 466 U.S. at 411.

In the instant matter, Cutaia's business contacts with Pennsylvania are of questionable jurisdictional relevance and far too sporadic to permit the assertion of general jurisdiction. First, the fact that Cutaia—acting as CEO of a Delaware corporation—entered into a single lease that directed payments to be made to a Pennsylvania address is of questionable jurisdictional relevance because—with limited exceptions—personal jurisdiction cannot be exerted "over an individual defendant whose only contacts with the forum state were taken in his or her corporate capacity." United Products Corp. v. Admiral Tool & Mfg. Co., 122 F. Supp. 2d 560, 562 (E.D. Pa. 2000). The same reasoning applies to Cutaia's brief tenure as director for a corporation (Sabre Industries) headquartered in Pennsylvania. Second, even if we could consider these two

contacts (i.e., execution of a single lease and assumption of a short-term directorship position that did not require any physical presence in Pennsylvania or knowledge of the company's headquarters location), they are not the kind of continuous and systematic contacts that warrant general jurisdiction.

Third, Cutaia's involvement with the pipeline project at Allied Fiber was a one-time, short-lived venture with only an incidental relationship to Pennsylvania. Although a portion of the pipeline would have traversed a portion of Pennsylvania, the aim of the project was to provide connections to and from cities in other states. Since Nautilus does not allege that Cutaia made any contacts with Pennsylvania as part of this project, Cutaia's work with Allied Fiber provides little basis to justify the assertion of general jurisdiction.

Fourth, it is irrelevant that, during Cutaia's tenure, Corinthian Capital hosted a conference in Pennsylvania and issued a sale of securities to all states, including Pennsylvania. See North Penn Gas Co. v. Corning Nat. Gas Corp., 897 F.2d 687, 690 (3d Cir. 1990) (stating that contacts must be "from actions by the defendant *himself*" (emphasis in original)).

Finally, Cutaia's co-management of a boxer in the early 1990s who fought just *one* of his *twenty-three* matches in Pennsylvania falls far short of establishing the requisite "substantial" connection that is required for general jurisdiction purposes. Metcalfe, 566 F.3d at 334; see also Strick Corp. v. A.J.F. Warehouse Distrib., Inc., 532 F. Supp. 951, 9596 (E.D. Pa. 1982) (suggesting that general jurisdiction requires a demonstration that the defendant "specifically targeted" or received a "significant portion" of its total revenues from the forum).

B.   **Specific Jurisdiction**

The test for establishing minimum contacts in the specific jurisdiction context is two-fold: (1) did the defendant "purposely avail" himself "of the privilege of conducting activities within the forum," and (2) did the litigation "arise out of or relate" to these activities? O'Connor, 496 F.3d at 317-18 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958) and Helicopteros, 466 U.S. at 414).  As discussed herein, Nautilus has failed to allege sufficient facts to make out a prima facie case of purposeful availment.

In the context of contractual disputes, a non-resident defendant purposely avails himself of the privileges of the forum by "reach[ing] out" and creating "continuing relationships and obligations" with residents of the forum state.  See General Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001) (quoting Burger King, 471 U.S. at 473).  The mere fact that a non-resident defendant enters into a contract with a forum resident is not sufficient, by itself, to establish purposeful availment.  Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino, 960 F.2d 1217, 1225 (3d Cir. 1992).  Courts must look instead to the "totality of the circumstances including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing," Remick v. Manfredy, 238 F.3d 248, 256 (3d Cir. 2001), and must consider the "contemplated future consequences" of the parties' actions, Burger King, 105 U.S. at 479.

As an initial matter, the Court will begin by addressing an issue that significantly bears upon all aspects of the purposeful availment analysis: namely, whether Cutaia was actually aware that Green Eye was a Pennsylvania company.  See Mickleburgh Mach. Co., Inc. v. Pac.

Econ. Dev. Co., 738 F. Supp. 159, 162 (E.D. Pa. 1990) (suggesting that a defendant who "is unaware of the citizenship of the plaintiff" does not purposely avail himself of the forum).

Nautilus contends that Cutaia's subjective knowledge of Green Eye's citizenship can be inferred from the following three undisputed facts: (1) Cutaia is a "sophisticated entrepreneur," (2) Cutaia knew Welhaf was a Pennsylvania resident; and (3) Green Eye's marketing material clearly stated that it was a company based in Pennsylvania. Nautilus buttresses this argument with dicta from the Third Circuit indicating that circumstances may exist where courts would be justified in holding a non-resident defendant to a "should have known" standard. See Mellon Bank, 960 F.2d at 1223. Although Welhaf's residency in Pennsylvania by no means implies that Green Eye was a Pennsylvania company,[6] it beggars belief that a sophisticated businessman and lawyer such as Cutaia would not have known or obtained this information, especially when it was readily stated on Green Eye's marketing materials. Nevertheless, the Court recognizes that the evidence demonstrating Cutaia's knowledge is far less here than in Phoenicia Sports & Entertainment, LLC v. New York Cosmos, LLC, No. 12-0772, 2012 WL 3155526, at *6 (E.D. Pa. Aug. 2, 2012), where this Court discredited the defendant's claims of ignorance. In light, however, of Nautilus's minimal burden at this stage in the litigation, the Court is persuaded that

---

[6] The residency of a company's employee(s), particularly in today's economy, often has little bearing on the residency of the company itself. This is evident by the fact that two of Welhaf's co-workers at the installation site were from Ohio and West Virginia. Dep. at 60. By itself, therefore, Cutaia's knowledge of Welhaf's residency would not be sufficient to meet Nautilus's burden of proof, even at this stage in the litigation (i.e., a pre-trial motion where no evidentiary hearing has been held).

Nautilus has at least established a factual dispute on the issue of whether Cutaia actually knew[7] or should have known that Green Eye was a Pennsylvania company.

Accordingly, because all factual disputes are to be resolved in Nautilus's favor, the Court will assume for this analysis that Cutaia was subjectively aware that Green Eye was a Pennsylvania-based company. This, of course, does not end the inquiry, and thus the other relevant considerations will now be addressed.

a)     *Location of the Contract Negotiations*

Although specific jurisdiction can be exerted over a non-resident defendant who does not physically enter the forum state, Mellon Bank, 960 F.2d at 1225, "the fact that the buyer negotiates the contract while visiting the forum state or makes a substantial number of telephone calls or mailings into the forum during the negotiation stage is . . . relevant to assessing whether the buyer has purposely availed itself of the opportunity of conducting activities in the forum," Strick, 532 F. Supp. at 959. Here, Cutaia never visited Pennsylvania at any point during the negotiations. Although there were meetings during the negotiation stage, these occurred exclusively in Delaware, New York, and Virginia. Dep. at 63-64. Further, while Cutaia received several mailings from Green Eye and/or Radius, the record contains no evidence and Nautilus does not allege that Cutaia sent any emails or letters, or made any phone calls, into Pennsylvania during the negotiation stage. The location of the negotiations thus provides no support for the assertion of personal jurisdiction in this case.

---

[7] The inference of subjective knowledge gains further, albeit weak, support from the fact that Cutaia believed his first meeting with Green Eye took place in Pennsylvania. Although the location of the meeting and location of the company's principal place of business are two distinct subjects, Cutaia's allegation suggests, and is consistent with, his subjective association of Green Eye with Pennsylvania.

*b)      Character of the Contract Negotiations*

In assessing the character of the contract negotiations, courts look to whether the non-resident defendant "played an active role in both developing and extending its contacts in the forum." Mickleburgh, 738 F. Supp. at 162. But see Deutz, 270 F.3d at 151 ("It is not significant that one or the other party initiated the relationship."). Courts also consider whether the non-resident defendant played an active role in shaping the terms of the agreement. See Stranahan Gear Co., Inc. v. NL Indust., Inc., 800 F.2d 53, 59 (3d Cir. 1986); Strick, 532 F. Supp. at 959. If the defendant was merely a "passive buyer" who was solicited by the forum company, or who initiated contact without engaging in vigorous negotiations to define the contractual terms, the basis for asserting personal jurisdiction is reduced. See, e.g., Vetrotex, 75 F.3d at 152; Stranahan Gear, 800 F.2d at 59. If, by contrast, the defendant solicits negotiations and "specifie[s] certain features" to customize the product to her particular needs, the basis for asserting personal jurisdiction is enhanced. Strick, 532 F. Supp. at 959-60.

Here, Cutaia did not actively solicit a relationship with Green Eye, or vigorously negotiate the terms of the oral contract that the parties entered into. First, despite Nautilus's characterization that Cutaia "actively chose to hire Green Eye," the undisputed facts show that hiring Green Eye was a non-negotiable term of Cutaia's contract with Radius. Dep. at 43; Aff. ¶ 22. Even assuming there are other manufacturers of WMD shelters, there is no other manufacturer that makes Radius shelters. Thus, if Cutaia desired to purchase a Radius shelter, he had one, and only one, option: accept Radius's requirement that Green Eye do the installation work. Cutaia's selection of Green Eye, therefore, is more reflective of a passive buyer than an entrepreneur actively soliciting business.

Second, there is no evidence to indicate that Cutaia ever attempted to negotiate the terms of his contract with Green Eye. Although Cutaia requested to speak with a customer who had a shelter installed by Green Eye, such a request does not constitute an attempt to shape a contractual term. Moreover, although Cutaia met several times with Green Eye representatives prior to the commencement of the installation, these meetings were held for the purpose of selecting the shelter's location. Dep. at 64. Rather than dictating to Green Eye where the shelter should be located, the record shows that Cutaia acted as a passive buyer by dutifully relying upon Green Eye's expert advice. See Cutaia's Am. Compl. ¶ 15. The character of the negotiations thus provides little support for asserting personal jurisdiction.

c)      *Terms of the Contract*

Contractual terms provide an important means to determine if the defendant could reasonably foresee being haled into the forum state's court system. Strick, 532 F. Supp. at 959. Terms indicating that the contract will be "substantially performed in the forum, that the law of the forum will control any disputes arising from the agreement, or that payment is directed to the forum" provide a basis to infer purpose availment. Id.; see also Mellon Bank, 960 F.2d at 1223 (citing contractual terms that required payment into the forum state as a basis for finding purposeful availment). Contractual terms also provide a useful means for assessing the "contemplated future consequences" of the parties' actions. See Burger King, 105 U.S. at 479. Where, for example, the terms provide that the parties' contractual relationship will not "extend over a significant period of time," a finding of purposeful availment will be harder to sustain. Rotondo Weinreich Enters., Inc. v. Rock City Mech., Inc., No. 04-5285, 2005 WL 119571, at *5 (E.D. Pa. Jan. 19, 2005).

Here, Cutaia and Green Eye entered into an oral contract that envisioned performance to be conducted in Virginia, not Pennsylvania. There is nothing in the record to indicate either a choice-of-law clause or a clause directing payments to be sent to a Pennsylvania address. Moreover, it is undisputed that Cutaia entered into the agreement based on Green Eye's representation that the manufacturing and installation of the shelter would take only four months, which is not a substantial period of time. See Rotondo, 2005 WL 119571, at *6 (concluding that a contract envisioning performance to be completed within one year "does not create long-term or substantial ties with the forum state").

While Nautilus argues that the existence of warranties is sufficient to establish a "continuing relationship" between Cutaia and Pennsyvlania, Nautilus has failed to allege facts or otherwise establish that the oral contract contained any such warranties. The record suggests, in fact, that no such warranties existed as Cutaia did not allege that Green Eye breached a warranty in his Virginia action (as he did against Radius). Cutalia's Am. Compl. ¶ 42-127. Further, Nautilus's claim that the oral contract created the possibility that Green Eye would be needed to conduct future maintenance work is flawed because it, too, is devoid of support in either Nautilus's allegations or the record as a whole.

Accordingly, other than the fact that Cutaia contracted with a Pennsylvania company, the terms of the contract establish no connection, either short-term or long-term, between Cutaia and Pennsylvania. The terms of the contract thus provide little support for asserting personal jurisdiction.

*(d)   Actual Course of Dealing*

The actual course of dealing between the parties is another factor that bears upon the personal jurisdiction inquiry. A non-resident defendant can be found to have purposely availed himself of the forum largely, if not "solely," on the basis of substantial post-sale contacts. Mellon Bank, 960 F.2d at 1223-24. In Mellon Bank, for example, the Third Circuit gave great weight to the fact that the non-resident defendants repeatedly reached out to a Pennsylvania bank to negotiate extensions to a loan that had previously been negotiated and executed outside of the forum. Id.; see also Mesalic v. Fiberfloat Corp., 897 F.2d 696, 700-01 (3d Cir. 1990) (finding minimum contacts based, in large part, on non-resident boat builder's post-sale visits to forum state to deliver and repair boat negotiated for and constructed elsewhere).

Not all post-sale contacts, of course, demonstrate purposeful availment. See, e.g., Dollar Savings Bank v. First Security Bank of Utah, N.A., 746 F.2d 208, 213-14 (3d Cir. 1994); Colmen Fin. Servs. v. Charter Equip. Leasing Corp., 708 F. Supp. 664, 668 (E.D. Pa. 1989). In Dollar Savings, for example, the Third Circuit held that purposeful availment was not established by the mere fact that non-resident defendants transmitted wire payments into Pennsylvania to pay off a loan from a Pennsylvania bank because the defendants negotiated for the loan with a New York firm and had no other contacts with Pennsylvania. 746 F.2d at 213-14. In Colmen, the court found personal jurisdiction lacking where the defendant's contacts with the forum included not only the transmission of payments but the initiation of 40 phone calls to the forum company. 708 F. Supp. at 668.

Here, Nautilus points to several post-sale contacts between Cutaia and Pennsylvania, including a single wire payment and a series of phone calls, emails, and text messages between

17

Cutaia and Welhaf.  These contacts, however, are even less substantial than the ones found insufficient in Colmen and Dollar Savings.  With respect to payments directed to the forum, Cutaia only sent one payment whereas the defendants in Dollar Savings and Colmen sent multiple payments.  Further, in contrast to the defendants in Colmen and Dollar Savings, Cutaia did not know the location of the receiving bank as he only had Green Eye's routing and accounting numbers.  Similarly, with respect to the phone calls, emails, and text messages, Cutaia did not know where Welhaf was located during these exchanges, and it is by no means likely (given that Welhaf was installing the shelter in Virginia) that Welhaf was in Pennsylvania for most or many of these exchanges. Dep. at 82.  Moreover, over 90% of the communications were initiated by Welhaf, often as a means of updating Cutaia on the progress with the installation.  Dep. at 54-55; 82.  By contrast, the Colmen defendant had initiated 40 of the 108 phone calls between the parties.  708 F. Supp. at 668.  Unlike in Colmen, therefore, the communications here were almost entirely the result of Green Eye's "unilateral activity."  See O'Connor, 496 F.3d at 317 (stating that minimum contacts must be a product of the defendant's "deliberate targeting" of the forum, not the "unilateral activity" of a forum resident).

     Even in the few instances where Cutaia initiated the exchange, they can properly be characterized as "informational communications in furtherance of [a contract between a resident and a nonresident]" and thus have little weight in the jurisdictional inquiry.  Vetrotex, 75 F.3d at 152.  Although Nautilus cites Cutaia's many attempts to contact Green Eye after the latter abandoned the job site, these too were informational communications in furtherance of the contract and would be inappropriate to hold against Cutaia.

Finally, this Court rejects Nautilus's argument that the long two-year length of time on which Green Eye worked on Cutaia's property provides any evidence of purposeful availment, as this was not envisioned in the terms of the contract and was entirely the responsibility of Green Eye and/or Radius. Cutaia, who had an interest in completing the project quickly to ensure the secrecy of the shelter, had been promised that the shelter's manufacture and installation would take no more than four months. The fact that the faulty performance of Green Eye and/or Radius prolonged the project thus constitutes "unilateral activity" and therefore a jurisdictionally insignificant contact. The parties' actual course of dealing thus provides little support for a finding of purposeful availment.

Based on the above considerations, Nautilus has failed to make out even a prima facie case that Cutaia purposely availed himself of the privileges of the forum. This conclusion is buttressed by the analysis in Rotondo where the court addressed functionally equivalent circumstances. See 2005 WL 119571, at *6. As with Rotondo, "the only contacts [Cutaia] has with the forum state are that [he] concluded a contract with a forum state plaintiff and sent some related communications to that plaintiff." Id. And, as with Rotondo, the contract between Cutaia and Green Eye was to "to be performed entirely outside the forum state," "does not contain a choice-of-law clause designating the application of forum state law," and "does not create long-term or substantial ties with the forum state." Id.

Because Nautilus has failed to establish that Cutaia purposefully availed himself of the benefits of the forum, the Court will not address whether Nautilus's request for declaratory judgment arises out of or relates to Cutaia's contacts with Pennsylvania.

## VI.     CONCLUSION

Based on the foregoing analysis, this Court does not have personal jurisdiction over Cutaia in this proceeding.  Because the parties concede that Cutaia is a necessary and indispensable party pursuant to Federal Rule of Civil Procedure 19(a)(2), the action will be dismissed.  Cutaia may file a motion for attorney's fees within 7 days.  If a motion is filed, Nautilus will have 7 days to respond.

An appropriate order follows.

O:\CIVIL 11\11-7322 Nautilus v Green Eye\memo_11.08.12.docx